PAULINE T. SMITH, an Infant, by MARY E. WATSON, Her Guardian ad Litem, Plaintiff, v. DELBERT ROSS SMITH, Defendant.

Supreme Court, Onondaga County, May 6, 1927.

**Husband and wife — annulment — plaintiff, in conjunction with her mother, forced defendant to marry her — marriage will not be dissolved where plaintiff never intended to remain defendant's wife — dissolution of marriage, because of non-age, is within discretion of court by virtue of Domestic Relations Law, § 7.**

This plaintiff, who, in conjunction with her mother, forced the defendant to marry her in order to legitimatize a prospective heir, cannot have the marriage

annulled because of plaintiff's non-age, where the dissolution would merely give relief to a party who has deliberately entered into a contract and compelled the other party, against his will, to do likewise, with the avowed intent of invoking the aid of the court immediately thereafter to undo what she was so insistent upon doing; plaintiff's marriage is not void *per se.*

Since the amendment of 1922 (Laws of 1922, chap. 313) to section 7 of the Domestic Relations Law, the dissolution of a marriage where one of the parties was under the age of eighteen does not follow as a matter of course but rests in the sound discretion of the court, to be exercised only where the circumstances of the particular case require it.

ACTION to annul marriage because of non-age of the plaintiff.

*Ralph Shulman,* for the plaintiff.

No appearance for the defendant.

EDGCOMB, J. Plaintiff brings this action to annul her marriage with the defendant upon the ground that she had not attained the age of legal consent when the ceremony was performed.

Since the amendment of 1922 (Laws of 1922, chap. 313), the dissolution of a marriage, where one of the parties was under eighteen years of age, does not follow as a matter of course, but rests in the sound discretion of the court, to be exercised in view of all the facts and circumstances of each case. (Dom. Rel. Law, § 7, as amd. by Laws of 1924, chap. 165.) The courts now move with extreme care in cases of this nature, and refuse to annul a marriage unless the incidents and events leading to the ceremony are such as to warrant such action. (*Lazarczyk* v. *Lazarczyk,* 122 Misc. 536; 121 id. 723; *Todaro* v. *Todaro,* 120 id. 807.)

This marriage is not void *per se.* It is simply capable of being adjudged of no force, if the facts justify such action. It does not become void until its invalidity is declared by a court of competent jurisdiction.

The contracting parties to a marriage are not the only ones interested in the result of a matrimonial action. Actions of this nature are far reaching, and questions of public policy are always involved, and influence, to a considerable extent, the decisions of the court. (*Cunningham* v. *Cunningham,* 206 N. Y. 341.)

It, therefore, becomes necessary to examine the facts surrounding the marriage in question to determine if this is a case where the court should exercise its discretion, and free the parties from what has turned out to be an undesirable union.

Plaintiff and defendant had been keeping company for some time, when the plaintiff found herself in the family way. She insisted that the defendant, who was the father of her unborn child, should marry her, and thus right the wrong he had done her, so far as that was possible. He refused. Plaintiff's mother then took a hand in

the proceeding in support of her daughter's demand. The poor authorities were consulted, and they, according to the testimony of the mother, refused aid unless the parties were married. Defendant at last surrendered, and, against his will, married the plaintiff on May 22, 1926. She was but sixteen years old at the time. While the defendant went through with his bargain, he left his wife at the altar, and has never lived with her since. The child was born June 27, 1926.

This is another example of the futility of forced marriages. Everyone will concede that a man who ruins a woman should marry her, but if he will not do so of his own free will and out of a sense of duty, no good can come from forcing him to do that which he is unwilling to do. The old adage, "A man convinced against his will is of the same opinion still," is as true to-day as when it was first uttered. Such a marriage may give to the prospective heir a name and save it from being branded as an illegitimate, but it cannot make a right out of a wrong, or undo that which should never have been done. Such a marriage could not possibly be a happy one, and children raised in an atmosphere engendered by such wedlock go through life with a great handicap. Such a union inevitably leads to the divorce court. Instead of correcting one evil, another is created, which is incapable of being shunned. Persuasion to induce a man to do the right thing is proper, but compulsion is a mistake. Efforts which go beyond persuasion, although many times well meaning, are, in my opinion, wrongfully misguided.

But this is not all. The mother, as well as the daughter, actually had in mind, when they were urging the defendant to go through this idle ceremony, that the marriage would legitimatize the child, and, if it did not turn out to the liking of the plaintiff, she could apply to the court to be freed from its obligations. Under this plan, the plaintiff had everything to gain and very little, if anything, to lose. She put a gun to defendant's head and made him marry her, intending to turn around the next minute, if it suited her fancy, and ask the court to undo the very thing she had forced the defendant to do against his will. Such conduct not only makes a farce of the marriage ceremony, but is an imposition on the court. The solemn promises which both parties made at the altar were not made to keep, but to be purposely broken. Plaintiff is not in a position to ask the court to exercise its discretion and relieve her of a bad bargain. Public policy will not permit one to grasp the benefits of a marriage contract with no intent to live up to its obligations, and the next minute throw it aside and ask for a destruction of the very status which he has insisted upon creating.

The courts were never organized for the purpose of giving relief to a party, who has deliberately entered into a contract and compelled the other contracting party, against his will, to do likewise, with the intent of invoking the aid of the court immediately thereafter to undo what he was so insistent upon doing. There are enough matrimonial cases on our court calendars at present without designedly adding to the number.

To dissolve this marriage under the circumstances would, in my opinion, have a tendency to be injurious to the public good. Unfortunate as this union may be for the plaintiff, it is of her own making. The public should be given to understand that the courts will not lend a willing ear to a plea of one who has deliberately entered into the most sacred contract which can be made, with her eyes wide open, and has compelled the other contracting party to do likewise, with the idea and hope that some complacent court will promptly undo what she was so anxious to accomplish. If the young people of this country could be made to understand that the marriage contract meant what it formerly did, a contract good for the life of the parties, and that it would not be set aside for the mere asking, I believe that there would be less unhappy marriages, and that the courts would be relieved of a few, at least, of these domestic tragedies.

The facts and circumstances surrounding this marriage are such that the court should not exercise its discretion and set it aside.

Complaint dismissed.